IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

JOSE A. RAMOS
MARIA GOMEZ

Plaintiffs

vs                                                      CIVIL 02-2707CCC

PHILIP MORRIS, INC.
R.J. REYNOLDS TOBACCO COMPANY

Defendants

# O R D E R

This is an action brought by two children of the late María Gómez- Capeles  against Philip Morris, Inc. and R.J. Reynolds Tobacco Co.  Plaintiffs contend that their mother's death from lung cancer on November 21, 2001, at the age of 61, resulted from her having smoked defendant's cigarettes for more than forty-eight years.  It is alleged that she developed an addiction due to the nicotine and other harmful ingredients contained in defendants' cigarettes, which caused her various health conditions.

Plaintiffs brought this action under the Federal Cigarette Labeling and Advertising Act (Labeling Act), 15 U.S.C. §1331, et seq., and our diversity jurisdiction.[1]

In an order dated September 28, 2004 (docket entry 69) the Court dismissed with prejudice those portions of Counts I, II, III, VI, and VII premised on post-1969 failure-to-warn claims.  Count IV, relating to the use of English for the warnings on cigarette packages and Count V, a frivolous claim under an unnamed law were dismissed in their entirety.  The court struck plaintiffs' demand for punitive damages.

The action is now before us on Defendant R.J.Reynolds Tobacco Co.'s Joint[2] Motion for Summary Judgment filed on November 11, 2004 (**docket entry 88**) requesting dismissal of

---

[1]Article 1802 of the Civil Code of Puerto Rico, 31 L.P.R.A. §3151.

[2]PhilipMorris, Inc., which filed this joint motion with Reynolds, is no longer a defendant in this action.

CIVIL 02-2707CCC                     2

the remaining claims. Plaintiffs opposed the motion (**docket entry 112**), and filed her exhibits separately (**docket entry 120**). Reynolds filed a reply (**docket entry 150**). Although we draw all reasonable inferences in favor of the non-moving party, Cruz Vargas v. R.J. Reynolds Tobacco Co., 348 F.3d 271, 280 (1st Cir. 2003), when faced with a properly documented summary judgment motion, the non-movant can thwart the motion only by showing through materials of evidentiary quality that a genuine dispute exists about some material fact. Costa v. Ames Department Stores, Inc. 386 F3d. 5, 8 (1st Cir., 2004); DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997) (non-moving party must respond to a properly supported motion with sufficient evidence to allow a reasonable jury to find in their favor with respect to each of the issues on which they have the burden of proof.)

## PLAINTIFFS' REMAINING STATE CLAIMS

Plaintiffs' remaining claims under Article 1802 of the Civil Code of Puerto Rico, 31 L.P.R.A. §5141, are based on strict liability and/or negligence in the design and manufacture throughout the entire period that their mother smoked cigarettes, as well as the strict liability for failure-to-warn claims which pertain to the pre-1969 period. They allege that defendant is subject to strict liability because it "manufactured, sold and distributed unsafe and defective tobacco products, mainly cigarettes containing ingredients harmful to human life . . .," and that Reynolds was negligent in that it breached its duty of reasonable care to the decedent by failing to design, test, manufacture and sell products that were not addictive or that did not contain unreasonable levels of nicotine and other substances hazardous to health.

## CONFLICT PREEMPTION

The doctrine of conflict preemption prevents the application of state laws in a manner conflicting with federal statutes. FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 121 (2000). Conflict preemption occurs where "a federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively or when state law is in actual conflict with federal law." Freightliner Corp. v.

CIVIL 02-2707CCC                                3

Myrick, 514 U.S. 280, 287 (1995).  Congress has foreclosed the removal of cigarettes and other tobacco products from the market.  Prado Alvarez v. R.J. Reynolds Tobacco Co., 313 F. Supp. 2d 61, 72 (D.P.R. 2004), aff'd, 405 F.3d 36 (1st Cir. 2005); FDA, 529 U.S. at 121 ("Congress' express policy is to protect commerce and the national economy while informing consumers about any adverse health effects.")  15 U.S.C. §1331 (1998 & Supp. 2004).  "[A]llowing tort actions against cigarette manufacturers and sellers for the allegedly negligent act of continuing to make and sell cigarettes would interfere with Congress' policy in favor of keeping cigarettes on the market."  Cruz Vargas v. R.J. Reynolds Tobacco Co., 218 F. Supp. 2d 109 at 118 (quoting Insolia v. Philip Morris Inc., 128 F. Supp. 2d 1220, 1224 (W.D. Wis. 2000)).

Pursuant to the doctrine of conflict preemption Reynolds cannot be held liable under Article 1802 for the manufacture and sale of cigarettes after the passage of the Labeling Act. Prado Alvarez, 313 F. Supp. 2d at 72-73.  Plaintiffs' claims premised on manufacturing and marketing an inherently dangerous product after 1969 are, therefore, DISMISSED, with prejudice.

COMMON KNOWLEDGE PRIOR TO 1969

In order to succeed on their pre-1969 failure-to-warn claims, plaintiffs must show that ordinary consumers were unaware of smoking dangers when the decedent became a smoker in 1953.  Prado Alvarez v. R.J. Reynolds Tobacco Co., 405 F.3d. 36, 38-39(1st Cir. 2005); De-Jesús Rivera v. R.J.Reynolds Tobacco, Inc., 368 F. Supp. 2d 148, 152 (D. Puerto Rico 2005).  A manufacturer cannot be held liable under either strict liability or negligence for failure to warn of a danger commonly known to the public.  Cruz Vargas v. R.J.Reynolds Tobacco, Inc., 348 F.3d, at 275.

Plaintiffs contend that Reynolds is strictly liable for Gomez-Capeles' cigarette related death because it failed to include warnings about the health hazards of their cigarettes at the time she started to smoke cigarettes in the early 1950s.  Reynolds contends that it was not

CIVIL 02-2707CCC                              4

required to provide warnings prior to the passage of the Labeling Act because the health hazards
and habituating effects of cigarettes were commonly known to the general public in Puerto Rico
at the time Gómez-Capeles began to smoke and/or there is no evidence that Reynolds' alleged
failure to warn proximately caused her injuries.

    The role of common knowledge[3] in determining the liability of the cigarette
manufacturers to consumers in Puerto Rico for alleged damages caused by smoking was recently
addressed by the Court of Appeals for the First Circuit in their decision in Prado Alvarez, 405
F.3d. 36.  At p. 39,  the Court stated:

> . . . [plaintiffs] may not prevail on either the common law failure to warn or the
> design defect claims unless they can show that the ordinary consumer was
> unaware of the dangers of smoking. . . . ("[A] manufacturer cannot be held
> liable under either strict liability or negligence for failure to warn of a danger
> commonly known to the public.)" . . . ("[A] manufacturer need not warn of a
> hazard if the average consumer ordinarily has knowledge of the dangers of the
> product.")  . . . a product is defective only if it is "dangerous to an extent
> beyond that which would be contemplated by the ordinary consumer who
> purchases it, with the ordinary knowledge common to the community as to its
> characteristics.")

(Citations Omitted.)

    Both parties have sought to establish their position on common knowledge before 1969
through expert evidence.  The Court of Appeals noted that the "'common knowledge' defense
is assessed objectively and, 'despite the nomenclature, it is a technical question involving
methods, financing, and sources of research beyond the competence of lay determination, at
least when pertaining to history forty or fifty years removed from the time of trial.'"  Prado
Alvarez, 405 F.3d. At 39-40 citing Cruz Vargas, 348 F.3d. at 273.

    Plaintiff's expert, Dr Luis E. Díaz-Hernández, holds a Ph.D. in history from the University
of Navarro in Spain.  He has worked for the past twenty-five years at the Pontifical Catholic
University in Ponce, Puerto Rico, in its Department of History, Fine Arts and Music, first as a

---

    [3]We will use the phrase "common knowledge" to refer to the knowledge possessed by
the ordinary  consumer in Puerto Rico about the health hazards of cigarettes and tobacco use.

CIVIL 02-2707CCC                          5

professor and since 2003 as department chairman.  This was his first  investigation related to tobacco use and his first experience as an expert witness in a court proceeding.

In his amended report,[4] Díaz states that his research consisted of exploring newspapers, advertisements and documents published in local newspapers since the 1930's, and interviews with "several" individuals who could provide information on the issue of the common knowledge of the Puerto Rican people, between 1930 and 1969, about the health damages related to tobacco use.  Díaz breaks the object of his investigation into determining "three main thematic pointers," which may be summarized as:  what was the common knowledge of Puerto Rican consumers about the hazards of tobacco use and its addictive nature  between 1930 and 1969.  For plaintiffs to prevail at this juncture on the failure-to-warn issue, Diaz' report had to create an issue of material fact as to whether the ordinary consumer was unaware of the dangers of smoking during the period.

Although Díaz correctly defines the parameters of the subject, his report reflects that the focus of his  investigation was very limited.  The findings are not responsive to the question of what the common knowledge was prior to 1969.  Instead, Díaz based his conclusions on information disseminated by a few specific sources and not what the public commonly knew from all available sources.  At page three of the amended report the summary of his findings demonstrates that, although the goal of his research was correct as initially stated, his definition of what could be considered as "common knowledge" was limited to governmental information:

> "Regarding the topics at issue, my findings reveal that before 1969, there was not an official, Puerto Rican educational, government directive  linked to the tobacco use.  The earliest evidence of official warning from the public Health, Federal or State government was in 1965...."

--------

[4]Plaintiffs, as Exhibit L to their opposition to summary judgment, presented Díaz' amended report.  Reynolds moves to strike the amended report, (**docket entry 127**) alleging that it is an attempt to cure defects by expanding the scope of his report, rather than supplementing it.  The Court DENIES the motion to strike and has considered that report in this decision.

CIVIL 02-2707CCC                              6

(Our emphasis.)

Díaz also states that his, "conclusion in this area is that before 1969, <u>there was not a structured, well planned, educational oriented campaign against the use of tobacco</u>."  He later states that "[i]t should be noted that in the 1950's and 1960's public sentiment in Puerto Rico was pro-tobacco because of the tax revenues received from tobacco production," which is inapposite to the matter of the common knowledge at that time.  While this may reflect support for tobacco as an agricultural crop and sale of it to cigarette manufacturers, or taxes received from the sale of cigarettes, it does not mean that consumers were unaware of the dangers or that they were willing to risk their health to support the economy.

To further support his findings he cites only two interviews with unidentified persons, the first one is the son of an accountant who stated that his father "<u>never received any warning verbal or otherwise by any local or federal agency</u> regarding the dangers of smoking, with the exception of the 1965 warning."  (Our emphasis.)  The second interview was with a doctor who was a heavy smoker who stated "that there were scientific studies published in specialized journals of Medicine of Science, and small local research papers by the League Against Cancer warning about the possible relation of tobacco consumption being a habit rather than an addiction," but that "this kind of information was not at hand to the public at large so its impact was close to nil within the general population." (Amended report, p. 4).

Díaz further demonstrates the serious limitations in the scope of his investigation:

Regarding the Island of Puerto Rico, <u>there is no evidence whatsoever of an "official campaign by any government agency</u> informing, inviting, or advising the general population to: a) stop smoking, b) of addiction and health risks due to smoke inhalation (second hand smokers) or any other physical condition or, c) and smoking restriction in public places (Exhibit). <u>If there was an official governmental directive in this area, there is not evidence that such was known, advised or enforced at the local government</u>.[5]

_____

[5]This paragraph does not state the time frame to which it applies, so we assume that it relates to the period before 1969.

CIVIL 02-2707CCC                              7

Id. (Our emphasis.)

Díaz' amended report demonstrates that his investigation  did not address the issue of
what was the level of the public's awareness in Puerto Rico about the hazards of cigarette
smoking prior to 1969, and instead  focuses only on what knowledge was available from
governmental sources.  Moreover, Díaz' seven-page amended report contains no citations to or
identification of specific sources used to form his conclusions.  While the word "exhibit" appears
in parentheses in several places, they are neither identified nor  attached to the report.[6]

We turn to the Reynolds' expert's evidence on the issue under discussion. Dr. Luis
Martínez-Fernández' qualifications are extensive;[7] we note here only that some of the
undergraduate and graduate level courses devoted to social history that he has taught  over the
past twenty-one years have addressed the role of tobacco in Caribbean and Latin American
culture, economy and society.  The report resulting from his investigation on the issue of
common knowledge was cited with approval by the Circuit Court in Prado Alvarez, 405 F.3d.
supra, at 42-43, when it determined that Martínez' report was sufficient to establish that the
cigarette manufacturer had no duty to warn consumers of risks and the addictive nature of
cigarettes because these dangers had been common knowledge in Puerto Rico in 1960, the year
in which the decedent in that case began to smoke.  His exposition of the information  available
in Puerto Rico began with cites to two articles in La Salud:  Seminario de Hygiene, published
in 1883, and other articles published in 1912, 1928, and 1932.[8]  Martínez provided over 100

---

[6]The weaknesses in Dr. Díaz' investigation and report are also noted  in De-Jesús-Rivera
v. R.J. Reynolds Tobacco, Inc., supra.

[7]. Dr. Martínez has appeared as the expert witness on the issue of common knowledge
of the health hazards of tobacco in several of tobacco cases that have been filed in this court.
His credentials are extensively discussed in Prado Alvarez, 405 F.3d. at40-41as are the details
of his investigation and methodology, at 41-43.

[8]The 1932 article from the Bulletin of the Medical Association of Puerto Rico included
this comment about tobacco: "The chemical and mechanical irritant actions of these agents,

CIVIL 02-2707CCC                        8

citations to specific articles and other sources directed to the dangers of smoking.  The materials
available to the general public during  the 1940s, 1950s and early 1960s directly from
magazines in ths Spanish language and indirectly through their doctors and other health care
professionals was extensive.  He cites articles published <u>Selecciones del Reader's Digest</u>, <u>Alma
Latina</u> and <u>El Mundo</u>, during this period relating tobacco use to lung cancer and  heart disease
and pointed out the difficulty in quitting the habit.  Martínez cites articles in the <u>Puerto Rico
Evangélico</u>, published between 1912 and1954, promoting that religious community's anti-
smoking efforts.  Other religious publications that warned of the dangers of smoking during the
period in question include <u>El Piloto</u>, <u>El Centinela</u> and <u>Atalaya</u>.  Also playing an important role
in disseminating information during the 1940s was the Puerto Rico Anti-Cancer League which
published many articles about the carcinogenic nature of tobacco.

Martínez  cites Gallup polls taken between 1949 through 1959 which demonstrate that
the general public was aware that smoking cigarettes was associated with disease.  Poll data
collected in Puerto Rico during 1964 showed that most people polled believed that smoking
was the primary cause of cancer.

Martínez concludes that:

> Based on a thorough and careful review of that large body of evidence, it is my
> firm professional opinion that during the entire period of Ms. María Gómez
> Serrano's (sic) lifetime, there was a broad and increasing public awareness of the
> health hazards of cigarette smoking, including an awareness of the specific hazard
> of cancer, and widespread awareness that cigarette smoking was a "habit" or an
> "addiction" or a practice that proved difficult for many people to quit.

Motion for Summary Judgment, Ex. 10, pp.33-34.

Given the limited scope of plaintiff's expert's testimony, in contrast to that of the
defendant's expert, no reasonable jury, confined to the record before us, could conclude that

---

particularly tobacco, on the epithelium in the bronchi and the pulmonary alveoli stimulate and
encourage metaplasia and neoplastic proliferation by repeated stimulation."  While this type of
article was not directly disseminated to the public in general, doctors would have been able to
advise their patients on the connection between smoking and lung cancer.

CIVIL 02-2707CCC                              9

the serious health risks caused by smoking cigarettes, including lung cancer, and the difficulty in breaking the cigarette habit, were not common knowledge to the general public in Puerto Rico by the time Gómez-Capeles began to smoke in the early 1950s.  We conclude, as the court did in <u>Prado Alvarez</u>, <u>supra</u>, that no reasonable juror could reject Martínez' detailed and comprehensive report in favor of Díaz' narrowly focused and unsupported conclusions.  Therefore, plaintiffs' claims for strict liability for sale of a dangerous and unsafe product based on Reynolds' failure to provide warnings about cigarettes prior to the implementation of the Labeling Act do not survive the motion for summary judgment.

DESIGN DEFECT

We must also examine plaintiffs' averments that defendant is liable for defective design of its cigarettes.  "A products liability plaintiff alleging failure to warn must prove '(1) the manufacturer knew, or should have known of the risk inherent in the product; (2) there were no warnings or instructions, or those provided were inadequate; (3) the absence of warnings made the product inherently dangerous; (4) the absence of adequate warnings or instructions was the proximate cause of plaintiff's injury.'" <u>Cruz-Vargas</u>, 348 F.3d 271 at p. 276.  Plaintiffs bear the burden of establishing the applicable standard of care, and of proving that PM USA acted below that standard.  <u>Prado Alvarez</u> 313 F. Supp. 2d at73.

In support of its request for dismissal of the claim based on alleged design defects, Reynolds submitted the declaration of its Vice President for Product Development, Dr. Jeffrey Gentry (Ex.11).  Dr. Gentry, who began his career with Reynolds as a research and development chemist in 1986,  stated that "there is no safe or risk-free cigarette," and that "tobacco and cigarette smoke naturally contain nicotine."   He discussed at length Reynolds' research and development in the field of cigarette design.  He addressed the company's efforts

CIVIL 02-2707CCC                    10

and results in reducing nicotine and tar in its cigarettes, while developing a product that is still

acceptable to the smoking public.  After addressing the plaintiffs' allegations regarding design

defects, Dr. Gentry stated, at paragraph 50:

> At all points in time of at least the last 60 years, cigarettes manufactured by
> Reynolds not only conformed to the generally-recognized state of the art, but in
> many instances established the state of the art in cigarette design.  No entity here
> or abroad, whether it be a governmental agency, academic institution or otherwise
> outside the tobacco industry, has developed a feasible alternative design for
> cigarettes that is superior to the designs developed and marketed by Reynolds.

Although plaintiffs submitted as exhibits articles[9] on cigarette design and composition,

they have offered no analysis of them in terms of the criteria for finding Reynold liable for the

defective design of its cigarettes.  Plaintiffs' only proffer on a design defect as a link in the chain

of the causal relationship is contained in the affidavit of their proposed expert witness,

pathologist Dr. Angel Roman-Franco which they seek leave to file.[10]  In his affidavit, (docket

entry 132 ex.1).  Dr. Román-Franco states that he is "of the opinion to a reasonable degree of

medical certainty  that María Gómez-Capeles illness and death were caused by the design and

addictiveness of cigarettes, which delivered nicotine and other carcinogens directly to [her]

lungs."[11]  His report (plaintiffs' opposition, Ex. T), however, is a general exposition of smoking

hazards, dangers, and statistics regarding comparisons between smokers and nonsmokers for

various diseases from which he concludes that the decedent died from lung cancer caused by

smoking.  The report contains no discussion regarding cigarette design, the applicable standard

---

[9]See, e. g. plaintiff's Exhibit AL– Joint Memorandum By Action on Smoking and Health
(ASH) and the Royal College of Nursing; and Exhibit AM–The safer cigarette: what the
tobacco industry could do and why it hasn't done it–both articles from the United Kingdom.

[10](Docket entry 132).  Defendant has opposed the motion for leave to file the affidavit
(docket entry 141), for reasons of its excessive untimeliness as well as admitted lack of
expertise.

[11]Defendant's opposition to the motion for leave to file Dr. Román-Franco's affidavit,
(docket entry 141) Exhibit A.

of care for the design process or how Reynolds failed to meet this standard.  See, Prado Alvarez, 313 F. Supp 2d, at 72.  The affidavit, where for the first time Dr. Román-Franco raises the issue of cigarette design, does not include any reference or citation to the sources from which he drew his conclusions.  In the excerpts from Román- Francos' depositions in this and a similar case,[12] he stated that his area of expertise is in pathology and immunopathology and that he is not an expert on either cigarette design or addiction.

In performing its gate-keeping function of assessing proffered expert evidence, a court must consider "whether the putative expert is qualified by knowledge, skill, experience, training or education."  Prado Alvarez, 405 F.3d. at 40." Although expert testimony may be more inferential than that of fact witnesses, in order to defeat a motion for summary judgment, an expert opinion must be more than a conclusory assertion about ultimate legal issues."  Hayes v. Douglas Dynamics, Inc., 8 F.3d. 88, 92 (1st Cir.,1993) (testimony is insufficient where an expert presents nothing but conclusions–no facts, no hint of an inferential process, no discussion of hypotheses considered and rejected).  See also, Daubert v. Merrill Dow Pharms., Inc., 509 U.S. 579, 592 (1993) ("relaxation of the usual requirement of first-hand knowledge . . . is premised on an assumption the expert's opinion will have a reliable basis in the knowledge and experience of his discipline").  We find that Dr. Román Franco, although a specialist in the field of pathology, does not qualify for consideration as an expert for the purpose of presenting conclusions about the  the design or addictiveness of cigarettes.  Aside from the untimeliness of the production of the affidavit, Dr. Román-Franco's admission that he does not have any expertise on these subjects would preclude the admissibility of his report.

We also note that plaintiffs have failed to demonstrate that either the alleged design defect or a failure to warn was a proximate cause of Gómez-Capeles' death from lung cancer.  Decedent's sister, Martha Gómez (Martha), testified at her deposition (p. 40) about how her

---

[12]Id. Exhibits B, C, D, H, and I.

CIVIL 02-2707CCC                    12

sister began to smoke at about the age of 11 and was able to hide the fact that she smoked from her parents until she was about 15 years old.  Neither of her parents smoked (p. 48).  When they found out that she was smoking, their father would tell Gómez-Capeles that smoking could cause damage(p. 43).  One of the reasons that Gómez-Capeles eventually moved out of her parents house was because she was tired of listening to her father complain about her smoking(p.44-45).  While she was pregnant with her first child, to whom she gave birth at age 18, she cut down on her smoking because her parents and other people were telling her that her smoking would damage the baby(p. 53).  Martha, also stated that in the early 1980s and 1990s she tried to convince Gómez-Capeles to stop smoking but Gómez-Capeles refused, stating that her lungs already had damage(p. 67).  She also stated that for at least ten years before her sister died, Gomez-Capeles  started having difficulties breathing and was in and out of hospitals. Martha Gómez also related that Gómez-Capeles' doctor told her not to smoke; that the cigarettes were killing her(p. 64).  Antonio Ramos-González, the father of three of Gómez - Capeles' children, testified at his deposition that he, too, had told her told her that smoking was dangerous and could be deadly and asked her to stop smoking (p. 41).

       As detailed above, Gómez-Capeles chose to disregard the warnings of family members from the age of 15 years to as late as the 1990's, when cigarette labeling was already warning of the connection to lung cancer and other serious diseases.  Her medical records reveal multiple hospitalizations, beginning as early as 1996, for illness that her doctors tied to her chronic smoking, and they repeatedly told her of the risks.  Thus, on the record before us, it appears that the verbal warnings from family members and medical professionals, as well as those implemented pursuant to the Labeling Act were irrelevant to the decedent's decisions about smoking.  See, Prado-Alvarez, supra at 42, citing Estate of White v. R.J. Reynolds Tobacco Co., 109 F. Supp. 2d 424, 435 (D. Md. 2000) (proof that decedent ignored verbal warnings and warnings on cigarette packages shows lack of proximate cause for decedent's cigarette related injuries).

CIVIL 02-2707CCC                              13

     For the above stated reasons, the Joint Motion for Summary Judgment (**docket entry 88**) is GRANTED, and this action is DISMISSED.

     SO ORDERED.

     At San Juan, Puerto Rico, on August 26, 2005.

                                        S/CARMEN CONSUELO CEREZO
                                        United States District Judge